## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **JESUS SALINAS, et al** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:18-CV-377** |
| | § | |
| **BEE COUNTY, et al.** | § | |
| **Defendants.** | § | |

## DEPUTIES ADRIAN PENA, ROBERT MEAKINS, GEORGE POYNTER, DEREK FRANCO AND RICK VILLARREAL'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Defendants, Deputy Adrian Pena, Robert Meakins, George Poynter, Derek Franco (collectively referred to as "Deputies"), and Rick Villarreal's[1] and file this, their Motion for Summary Judgment based on Qualified Immunity on all constitutional claims[2] made against them, and in support hereof would show the Court as follows:

### I.    Grounds for the Deputies' Motion (Qualified Immunity)

1.    Plaintiffs' excessive force action should be dismissed because the undisputed summary judgment evidence confirms the Deputies did not use excessive force on May 10, 2017 against Jaime Salinas ("Salinas") when executing a Mental Health Warrant for Emergency Detention ("the warrant"). On the day of the incident, mental health care professionals obtained the warrant for the emergency detention of Salinas at a mental healthcare facility. After Salinas refused to cooperate with EMS to be transported to the facility and took a defensive position in the bed of a pickup truck, law enforcement was called to the scene. Despite the deputies attempt to convince him to go willing,

---

[1] Plaintiffs have agreed to no longer pursue claims against Deputy Villarreal. However, as of the date of this motion, Deputy Villarreal has not yet been formally nonsuited. Deputy Villarreal was not present at the scene until after the last time Salinas was in the care of EMS. He had no personal involvement in the handling of Salinas on May 10, 2017. As such, a section 1983 claim cannot be sustained against him. Ex. 11, page 8, line 10 – page 9, line 9.

[2] Plaintiffs have agreed to no longer pursue the state law claims alleged in Jesus Salinas' complaint.

Salinas continued to refuse to be transported. Then, the Deputies attempted to remove him from the bed of a truck by going hands on, at which time, Salinas became violent, kicking at Deputy Meakins and Poynter, and resisting Deputy Pena's attempt to get him under control. During this struggle which lasted less than a minute and a half, Salinas punches Deputy Pena. Ultimately, Salinas complied after Deputy Pena sprayed two shorts bursts of pepper spray in Salinas' face and Deputy Meakins' bluff they would next tase him. This use of force by the Deputies was objectively reasonable in light of the totality of the circumstances. Furthermore, if a fact issue exists as to whether the use of force was "clearly excessive" and "objectively unreasonable", the Deputies are nonetheless entitled to *qualified immunity*, because the law is not clearly established that the use of force by the Deputies was "clearly excessive" and "objectively unreasonable" in response to Salinas's conduct.

2.      Furthermore, the Deputies are entitled to qualified immunity on Plaintiffs' deliberate indifference to Salinas' medical needs claim because the summary judgment evidence conclusively establishes that the Deputies were not aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that the Deputies actually drew the inference, and that the Deputies disregard[ed] that risk by failing to take reasonable measures to abate it. Once Salinas was pepper sprayed, EMS was immediately contacted to decontaminate him. EMS arrived in fifteen (15) minutes and took Salinas under their care for approximately sixteen (16) minutes during which they not only decontaminated him, but performed a medical assessment of him. After the assessment, the certified paramedic medically cleared Salinas and returned him to the care of Deputy Pena and Lt. Franco to await the arrival of another EMS crew to transport him to the MHMR hospital.[3] Salinas was placed back in the police vehicle, which was running with the air conditioner on and the back window partially rolled down, for approximately twenty (20) minutes after being medically cleared

---

[3] Deputy Meakins and Poynter both left the scene while Salinas was in the care of EMS getting decontaminated and medically assessed.

while waiting for the EMS transport crew. During that time, Deputy Pena performed periodic visual checks of Salinas and even got in the police vehicle to move the vehicle at one point in time. At no time did Deputy Pena or any of the other Deputies believe Salinas suffered from a serious medical condition. At the very least, the law is not clearly established that the Deputies' conduct towards Salinas' medical care violated Salinas' constitutional rights.

## II.    Factual Background

3.     On May 10, 2017, Plaintiff Beatrice Salinas ("Salinas' mother") and Ruben Meza ("Meza") took her son, Salinas, to Coastal Plains Mental Health Center ("Coastal Plains") in Beeville, Texas for an appointment sometime around 1:45 p.m.[4] While there, Salinas' mother spoke privately with Salinas's doctor and Salinas' mother informed him that Salinas had not been sleeping or eating, and that he seemed confused and was acting like he did when he was last hospitalized two weeks prior.[5] The doctor, nurse, counselor and Salinas' mother all agreed Salinas needed to be hospitalized again.[6] As such, Salinas' counselor then left to get the Warrant because Salinas exhibited "signs of psychosis and [] his mental health [was] deteriorating" and upon belief Salinas posed a substantial risk of harm to himself and others.[7] Obtaining the warrant took over two hours and during that time Salinas' mother and Meza remained with Salinas at Coastal Plains.[8] As time went on, Salinas got tired of waiting and asked his mother to take him home.[9] Salinas' mother, however, told Salinas it was best to wait at Coastal Plains and go to the hospital.[10] Salinas' mother repeated those concerns to Salinas

---

[4] Ex. 6, page 15, lines 14 – 24.
[5] Ex. 6, page 16, line 10 – page 17, line 1.
[6] Ex. 6, page 20, lines 11 – 19.
[7] Ex 1 & Ex. 6, page 20, lines 20 – 25.
[8] Ex. 6, page 21, lines 1 – 5.
[9] Ex. 6, page 22, lines 3 – 18.
[10] *Id.*

over and over as he continued to ask her to take him home.[11] Finally, the counselor arrived with the Warrant as did the EMS that was going to transport him.[12]

4. Deputy Poynter was dispatched to serve the Warrant upon Salinas at Coastal Plains and did so at approximately 4:45 p.m.[13] Deputy Poynter then left Coastal Plains as the EMS crew did some additional paperwork.[14]

5. Wendy Elliott, one of the EMS crew members, communicated to Salinas' mother and Salinas the details about where he would be transported and how long it would take.[15] During the initial portion of the conversation Salinas sat calmly on the ground.[16] But, over the course of their discussion Salinas became agitated and exhibited a significant mood change and refused to be transported.[17] He eventually arose from his seated position on the ground in an aggressive manner such that Ms. Elliot believed Salinas was going to lunge at her.[18] Ms. Elliot backed away to avoid any confrontation with him and Salinas proceeded to walk to the back of the Meza's pickup truck which they arrived in.[19] Once there, Salinas climbed into the bed of the truck and placed himself in a defensive position towards the cab.[20]

6. Ms. Elliott then called dispatch to request assistance from a deputy to which Deputy Poynter responded again.[21] Two more deputies, Lt. James Franco and Deputy Pena arrived at approximately the same time as Deputy Poynter.[22] The Deputies attempted to talk Salinas into cooperating with Ms. Elliott so he could be transported to Palms Behavioral Health in Harlingen, Texas (the "Palms").[23]

---

[11] *Id.*
[12] Ex. 6, page 22, lines 19 – 22 & Ex. 12.
[13] Ex. 1 & Ex. 9, page 15, lines 5 – 18.
[14] Ex. 9, page 16, lines 15 – 24.
[15] Ex. 12.
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] Ex. 12.
[22] Ex. 9, page 18, lines 10 – 16 & Ex. 7, page 60, line 22 – page 61, line 12.
[23] Ex. 2.

7.      At this point in time Salinas, lay face down in the bed of the truck periodically grabbing onto a rope tied to the bed near the cab. Lt. Franco spoke to Salinas for several minutes attempting to convince Salinas to go willingly with EMS to the Palms and that he didn't have a choice.[24] Lt. Franco specifically asked Salinas to sit up and talk to him but, Salinas refused and remained lying face down in the bed of the truck.[25]

8.      Deputy Pena then attempted to convince Salinas to come out of the truck.[26]  Salinas again refused.[27]  Then, Meza who lived with Salinas, also tried to persuade Salinas to go willingly.[28]  In response, Salinas turned over and went on a profane rant about not wanting to go to the hospital which included Salinas telling everyone to leave him the "f*** alone".[29]  Then, Salinas looked at Deputy Pena who stood alongside the bed of the truck and called him a "f****** b****".[30]

9.      Despite these obscenities, they continued to speak to Salinas in a calm, professional manner urging him to go.[31]  Lt. Franco tried again to speak with Salinas and Salinas told him to "get the fu** out of here".[32]  At that point in time Lt. Franco informed him that if he did not agree to go voluntarily that they would have to take him forcefully.[33]  Salinas responded that they would have to take him forcefully, turned over face down again in the rear of the truck, and continued to defy everyone's attempts to get him to go willingly.[34]

10.      By this time, Ms. Elliott had called her supervisor to discuss Salinas's transport because she feared Salinas may become combative due to his agitated state and signs of aggression.[35]  Her

---

[24] *Id.*; Ex. 3.
[25] Ex. 2.
[26] Ex. 2; Ex. 7, page 82, lines 7 – 12.
[27] Ex. 2.
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] Ex. 2.
[33] *Id.*
[34] *Id.*
[35] Ex. 12.

supervisor made the decision that a more experienced EMS unit comprised of two male technicians would transport Salinas instead.[36] Ms. Elliott then left the scene at approximately 5:02 p.m. while Salinas was still in the bed of the pickup truck with the deputies talking to him.[37]

11. Salinas then laid down in the bed of the truck again as the Deputies present continued to urge Salinas to go voluntarily. Salinas refused and showed no willingness to cooperate.[38] Lt. Franco warned Salinas the he and the Deputies would take him into custody in handcuffs if he insisted on not cooperating.[39] Salinas responded by telling Lt. Franco to leave him the "f*** alone".[40] Salinas rolled over facing the cab of the truck and latched onto the rope clearly preparing to resist.[41]

12. Since Salinas continued his refusal to be leave cooperatively, Lt. Franco discussed with Deputy Pena his availability to transport Salinas in a police vehicle to which Deputy Pena agreed and moved his police car close to the rear of the truck.[42] Lt. Franco then made the decision to physically remove Salinas from the bed of the truck given the extent of time Salinas had refused to be transported even after EMS' attempt to transport him and all the other efforts made to convince Salinas to voluntarily go by multiple individuals.[43] Lt. Franco informed the Deputies to grab Salinas once he let go of the rope.[44]

13. However, prior to going hands on, Lt. Franco again approached Salinas and implored Salinas to roll over and speak with the him one last time.[45] Salinas refused to roll over and talk with him and remained laying down facing the cab of the truck.[46] Salinas then briefly let go of the rope and Deputy

---

[36] *Id.*
[37] *Id.*
[38] Ex. 2.
[39] *Id.*
[40] *Id.*
[41] *Id.*; Ex. 10, page 20, line 14 – page 21, line 8.
[42] Ex. 7, page 96, lines 9 – page 97, line 1.
[43] Ex. 10, page 19, lines 2 – 22 & page 20, line 24 – page 25, line 1.
[44] Ex. 10, page 21, lines 2 – 8.
[45] Ex. 2.
[46] *Id.*

Meakins grabbed Salinas's leg.[47] Salinas immediately resisted and became physically combative, kicking at the deputies.[48]

14.     Deputy Pena jumped into the bed of the truck in an attempt to gain control of Salinas while the other officers tried to hang onto Salinas's legs.[49] Salinas, however, continued to resist the Deputies' attempts to pull him towards the rear of the truck.[50] Due to Salinas's combativeness, Deputy Meakins shouted for someone to spray Salinas with pepper spray in an attempt to gain control of him.[51] Shortly thereafter, Salinas punched Deputy Pena in the face.[52]

15.     Salinas continued to struggle with the officers prompting Deputy Pena to give two short bursts of pepper spray to Salinas' eyes.[53] The pepper spray, however, was not enough to cause Salinas to comply with the Deputies' commands.[54] Instead, Salinas continued to resist and refused to place his hands behind his back.[55] Deputy Meakins then threatened he would tase Salinas in an attempt to get him to stop fighting and comply with commands to put his hands behind his back.[56] Though none of the deputies carried tasers, the bluff worked and Salinas finally submitted and put his hands behind his back and was handcuffed. Immediately after Salinas was placed in handcuffs and was still in the bed of the truck, Deputy Meakins said to call EMS to decontaminate him.[57] At that point in time the Deputies helped Salinas down from the truck and placed him in the rear of Deputy Pena's police car, then awaited an ambulance to come and decontaminate him.[58] The entire struggle lasted less than a minute and a half.[59]

---

[47] Ex. 2 & Ex. 3.
[48] *Id.*
[49] *Id.*
[50] Ex. 2
[51] Ex. 8, page 35, lines 19 – 21 & Ex. 7, page 102, lines 12 – 24.
[52] Ex. 7, page 102, lines 12 – 24.
[53] Ex. 7, page 103, line 25 – page 104, line 5 & page 104, line 22 – page 105, line 3.
[54] Ex. 2 & 3.
[55] Ex. 2 & 3.
[56] Ex. 2 & 3; Ex. 7, page 105, lines 6 – 16; Ex. 8, page 36, line 24 – page 37, line 8.
[57] Ex. 2 at 15:54 & Ex. 3 at 1:45.
[58] Ex. 2 & 3.
[59] *Id.*

16.     EMS arrived approximately fifteen (15) minutes after Salinas was placed in the patrol vehicle.[60]  While Salinas was in the back of the police vehicle, the patrol vehicle remained running, the windows were rolled down and the air conditioner on.[61]  As seen in the video of Salinas in the rear of the police vehicle, Salinas is exhibiting the effects consistent with someone who was just in a brief physical altercation with law enforcement and was pepper sprayed.[62]

17.     Once EMS arrived to decontaminate Salinas, he was removed from the back of the police vehicle and walked under this own power to the EMS unit which was several feet away and examined by EMS.[63]  The EMS crew had a certified paramedic in Chris Wheeler who performed the decontamination and medical evaluation of Salinas.[64]  Salinas was originally examined by EMS outside the police vehicle before stepping into the back of the EMS unit under his own power to receive a more thorough examination.[65]  The examination included a neurological exam, taking Salinas' vitals, and a medical assessment which included making a general impression, primary assessment and secondary assessment.[66]  Salinas was in the care of EMS for approximately sixteen (16) minutes.[67]  After EMS finished decontaminating Salinas and examining him, they medically cleared him and turned him back over to the custody of the Deputies.[68]  Salinas, got out of the EMS unit on his own and walked back to Deputy Pena's police vehicle where he was then placed back in the back seat like before.[69]

---

[60] Ex. 4—this video of Salinas in the back of the police vehicle starts shortly after he is placed in the back seat and ends when the Deputies remove him to be decontaminated by EMS.  Ex.7, page 118, line 25 – page 119, line 22 and page 126, lines 16 – 21.

[61] Ex.7, page 118, line 25 – page 119, line 22 and page 138, lines 2 - 5; Ex. 4.

[62] Ex. 4; Ex. 7, page 122, lines 10 – 15.

[63] Ex. 13.

[64] *Id.*

[65] Ex. 13.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Ex. 13; There is no video of the Salinas in the back of the police vehicle after he is decontaminated and examined by EMS.  Deputy Pena's camera was running low on battery (only had 2 minutes and 35 seconds of power left).  Deputy Pena did not see the need to run the remaining portion of his battery life at this time because Salinas was being compliant and had just been medically cleared by EMS.  Ex. 5; Ex. 7, page 145, lines 12 – 16.

18.     Deputy Meakins left the scene when EMS was decontaminating and examining Salinas and Deputy Poynter left shortly after.[70]  They had no involvement with Salinas after this time.[71]

19.     Once EMS decontaminated and medically cleared him, they informed Deputy Pena and Lt. Franco that another EMS crew had been assigned to transport Salinas.[72]  That EMS crew consisted of Kevin Smith and James Tawater both of whom were known to have some law enforcement experience, so presumably the EMS company felt comfortable with them making the transport even if Salinas became uncooperative and combative again.  As such, Salinas remained in the back of the police vehicle for approximately twenty (20) minutes until the EMS crew arrived to transport him.[73]  During that time, the patrol vehicle was running with the air conditioner on and the back windows partially rolled down.[74]  Also, during that time, Deputy Pena got into his police vehicle and moved it a few feet in order to allow Salinas' mother and Meza to move their truck and go get something to eat.[75]  In addition, throughout that time period, Deputy Pena and Lt. Franco visually checked on Salinas through the windows of the police vehicle.[76]

20.     When the EMS transport crew arrived, Deputy Pena and Lt. Franco and the EMS crew went to get Salinas out of the patrol vehicle.[77]  When they open the door, they thought Salinas was sleeping.[78]  They first tried to wake him up, but shortly realized that he was unresponsive.[79]  EMS immediately took over and tried to resuscitate him; however, he did not respond and was taken to the

---

[70] Ex. 8, page 39, lines 15 – 19; Ex. 9, page 49, lines 10 – 17.
[71] *Id.*
[72] Ex. 7, page 137, lines 15 – 20.
[73] Ex. 13, ex. A; Ex. 4 & 5.
[74] Ex. 5; Ex. 7, page 137, line 21 – page 138, line 5.
[75] Ex. 7; page 149, lines 1 – 21.
[76] Ex. 7, page 137, line 6 – page 140, line 20.
[77] Ex. 5.
[78] Ex. 7, page 139, line 19 – page 140, line 20; Ex. 10, page 41, lines 7 – 12.
[79] Ex. 5.

local emergency room where he was later pronounced deceased.[80]  The cause of death was later determined to be sudden cardiac arrest.

### III.  Summary Judgment Evidence

21.     In this *Motion for Summary Judgment*, Deputy Pena, Deputy Meakins, Deputy Poynter and Deputy Franco rely upon the following evidence:

Exhibit 1:      Mental Health Warrant for Emergency Detention

Exhibit 2:      Deputy Pena's first body camera recording;

Exhibit 3:      Sergeant Poynter's body camera recording;

Exhibit 4:      Deputy Pena's second body camera recording;

Exhibit 5:      Deputy Pena's third body camera recording;

Exhibit 6:      Deposition excerpts from Beatrice Salinas's deposition;

Exhibit 7:      Deposition excerpts from Adrian Pena's deposition;

Exhibit 8:      Deposition excerpts from Robert Meakins' deposition;

Exhibit 9:      Deposition excerpts from George Poynter's deposition;

Exhibit 10:     Deposition excerpts from Derek Franco's deposition;

Exhibit 11:     Deposition excerpts from Rick Villarreal's deposition;

Exhibit 12:     Affidavit of Wendy Elliot;

Exhibit 13:     Affidavit of Chris Wheeler;

Exhibit 14:     Affidavit of Kevin Smith; and

Exhibit 15:     Declaration of Margo Frasier.

### IV.  Legal Standards

#### A.  Legal Standard for Summary Judgment

22.     Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue exists "if the

---

[80] Ex. 5; Ex. 14.

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements).

23. The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material". Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

24. To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set

forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

### B. Legal Standard for Qualified Immunity

25.     Qualified immunity serves to protect public officials from discovery and liability, except where a plaintiff shows that (1) the official's conduct violated a constitutional or statutory right, and (2) the official's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. *McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002). A public official/employee violates "clearly established law" when, at the time of his conduct, the contours of a right are so clear that "every reasonable official" would understand his conduct violates the right. *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (citations and quotations omitted).

26.     "A qualified immunity defense alters the usual summary judgment burden of proof. Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). "When a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment, a court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). Qualified immunity applies "unless the defendant's conduct violated a clearly established constitutional right." *Id*. District courts may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Again, in the qualified immunity context, the burden of proof is on the Plaintiff. In order to survive Summary Judgment, the Plaintiffs must prove that they have evidence which at least create a fact issue that the Defendants are not entitled to qualified immunity. Here, Plaintiffs have no evidence which creates such a fact issue. To the contrary, the uncontroverted Summary Judgment evidence establishes Defendants' right to qualified immunity.

### C. First Prong: Violation of a Constitutional Right

27.    "In the Fifth Circuit, to succeed on an excessive force claim, the plaintiff bears the burden of showing: (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass*, 814 F.3d at 731 (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

### D. Second Prong: Clearly Established

28.    In the excessive force context, a constitutional violation is clearly established if no reasonable officer could believe the act was lawful. *Manis v. Lawson*, 585 F.3d 839, 846 (5th Cir. 2009). Conversely, an officer's conduct is lawful if a reasonable officer could have believed the act was lawful. *See id.* This standard is designed to shield "from civil liability 'all but the plainly incompetent

or those who knowingly violate the law.'" *Id.* at 845 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). It "thus protects an officer with a mistaken, yet reasonable understanding of the law from the 'hazy boundary between excessive and acceptable force.'" *Manis*, 585 F.3d at 846 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hanks*, 853 F.3d at 746–47 (quoting *White v. Pauly*, — U.S. —, 137 S.Ct. 548, 551 (2017) (per curiam)).

## V.  Argument and Authorities

### Excessive Force Claim

29.     The Court should grant Deputies Pena, Meakins, Poynter and Lt. Franco's[81] motion for summary judgment as to their qualified immunity defense because, even viewing the undisputed facts in the light most favorable to Plaintiff, the Deputies use of force against Salinas was not excessive and objectively unreasonable. Further, based upon the facts and law, a reasonable officer could have believed their conduct was lawful under the circumstances.

### A.  The Deputies use of force was reasonable

30.     Plaintiffs cannot overcome the first prong of the qualified immunity defense because the Deputies use of force was reasonable under the circumstances and therefore did not violate Salinas's constitutional rights. Making the determination of whether force used is excessive or unreasonable depends on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darden v. City of Ft. Worth*, 880 F.3d 722, 728-29, 5th Cir. 2018) (citing *Graham*, 490 U.S. at 396, 109 S.Ct. 865).

---

[81] Deputy Villarreal was not present when the Deputies went hands on and, as such, there cannot be an excessive force claim made against him.

14

31.     First, the court considers the severity of the crime the suspect committed or is suspected of committing. *Graham*, 490 U.S. at 396. In this case, Salinas had not committed any crime and was not suspected of committing any crime at the onset of his interaction with the Deputies. Rather, Salinas was the subject of a mental health warrant for emergency confinement to a mental health facility. The applicant for the Warrant swore that she believed Salinas evidenced a substantial risk of serious harm to himself or others.

32.     Once EMS arrived and the warrant served, Salinas refused to be transported and exhibited behavior that prompted EMS to call for assistance from the sheriff's department. Then, Salinas climbed into the back of Plaintiff Salinas' truck and lay there in a defensive posture holding onto a rope tied to the truck's bed toward the front cab. The Deputies responded to the scene and, appropriately, they attempted to talk Salinas into voluntarily going with EMS. The Deputies continued those efforts for approximately fifteen (15) minutes and Salinas showed no signs of any willingness to comply and refused multiple attempts by the Deputies to reason with him. During that same time, Salinas also rejected a plea to go with EMS from Meza, a stepfather like figure, who the Salinas' lived with. Salinas responded to him and the Deputies pleas to cooperative with aggressive, profane laced outbursts. Salinas ultimately became non-responsive to any communications by the Deputies and exerted signs of physical resistance as he latched on to the rope tied to the bed of the truck.

33.     The Deputies efforts to talk Salinas into voluntarily going with EMS had failed. Salinas continued to defensively lay in the bed of a truck, grabbing onto the rope, and showing no signs of any willingness to communicate. In order to execute the warrant, the Deputies were forced to make the decision to physically grab Salinas once he let go of the rope in order to lessen any potential resistance. Unfortunately, Salinas immediately and fiercely resisted the Deputies when they grabbed

his leg to remove him from the truck. At this point in time, Salinas had committed the crime of resisting arrest, warranting a higher use of force.

34.    Salinas' conduct now takes us to the second phase of the Court's analysis on excessive force: did the subject pose an immediate threat of harm to officers or others? *Graham*, 490 U.S. at 396. It is the essence of a mental health warrant for emergency detention that the subject poses a substantial risk of serious harm to himself or others. Such a warrant was issued by an independent magistrate for Salinas. The warrant deemed Salinas a serious risk of harm to himself or others as determined by those in the best position to evaluate him, his mental healthcare professionals and Plaintiff Salinas, his mother. Thus, from the onset of their interaction with Salinas, the Deputies were aware of Salinas's risk of harm to himself or others.

35.    Then, during the execution of the warrant, Salinas placed the Deputies immediately in harm's way. Salinas physically resisted arrest as he kicked at, wrestled with, and flailed around while repeatedly refusing to comply with the Deputies' commands. Through his conduct, Salinas endangered both the Deputies and himself.  His actions also make obvious the third criteria contemplated by the courts favors the use of force utilized by the Deputies. Salinas's physical efforts to resist violently escalated during his struggle with the Deputies. He even punched Deputy Pena in the face.  In an attempt to gain control of Salinas, Deputy Pena was forced to use two short bursts of pepper spray in Salinas' eyes. However, Salinas continued his combativeness until he heard a bluff by Deputy Meakins that they would next tase him. Finally, Salinas complied with the Deputies' commands and he was handcuffed and placed in the back of a deputy's car.  The whole struggle lasted less than a minute and a half.

36.    The *Graham* criteria for accessing excessive force conclude the Deputies' conduct during the execution of the Warrant did not reach the level of excessive force. Salinas rejected his family', EMS' and the Deputies' efforts to persuade him to cooperate in his transport. Over the course of his

interaction with EMS personnel and the Deputies, Salinas made vulgar and aggressive statements that included threats of force and/or violence. Ultimately, Salinas shut down the lines of communication and made clear he would not go voluntarily. As the Deputies tried to take Salinas into custody, Salinas engaged in a physical, combative struggle with the Deputies during which he kicked Deputy Meakins and Poynter and punched Deputy Pena as they attempted to remove him from the bed of the truck. In light of the totality of the circumstances, including analysis of the *Graham* factors, it is clear the Deputies acted with objectively reasonable force. Lastly, the competent summary judgment in that of Margo Frasier's declaration conclusively establishes that given the circumstances presented to the Deputies a reasonable officer could have reasonably concluded that Salinas was not going to comply with their orders and submit to being taken into custody without the use of force.[82] In addition, her declaration conclusively establishes that a reasonable office could have concluded that an acceptable course of action was to apply force in going hands on to remove Salinas from the bed of truck once he would not go voluntarily and the use of a chemical agent was an acceptable course of action to quickly gain compliance from Salinas lessening the ultimate amount of force needed once he resisted.[83]

### B. The Deputies use of force did not violate clearly established law

37.     A reasonable officer could have believed that it was lawful to grab and handcuff a noncompliant individual who was the subject of a warrant after he refused multiple attempts by officers to persuade him to voluntarily transport to a mental health facility. In addition, a reasonable officer could have believed the use of pepper spray was lawful on a subject who physically resisted, which included kicking and even punching the officers, as they tried to detain him. The summary judgment evidence presented through the video documenting the events along with the proffered

---

[82] Ex.15.
[83] *Id.*

testimony, makes clear that a reasonable officer, given the totality of the circumstances, could believe that his conduct was lawful. Further, no case law exists establishing a violation of the Fourth Amendment beyond debate at the time of the incident made the basis of this suit. In fact, the existing case law favors the Deputies.

38.     The Fifth Circuit as recent as 2019 reversed a denial of summary judgment and rendered judgment while holding that police officers did not violate clearly established Fourth Amendment law, and therefore they were entitled to qualified immunity to claim of excessive force, by forcibly moving a person who was handcuffed to floor in triage room following transport who already had met statutory requirements in Texas for apprehension on basis that he was mentally ill and posed substantial risk of serious harm to himself or others and continued to be increasingly aggravated and failed to comply with instructions to stop, even though he collided with cabinet on way down. *Rich v. Palko*, 920 F.3d 288 (5th Cir. 2019). Furthermore, in *Wagner*, the Fifth Circuit held that "nothing about the use of chemical spray or even a choke-hold was objectively unreasonable conduct where the suspect physically resisted arrest". *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000). In addition, in *Griggs*, the Fifth Circuit held that an individual actively and physically resisting the act of being handcuffed following commands to place the hands behind the back allows for reasonable physical force to subdue and gain compliance. *Griggs v. Brewer*, 841 F.3d 308, 314 (5th Cir. 2016). Furthermore, it is unquestionable officers have a right to employ some level of force in order to effectuate an arrest and in effectuating an arrest, a police officer "may exert such physical force as is necessary to effect the arrest by overcoming the resistance he encounters." *Wallace v. Harber,* 1993 WL 82379, *3 (5th Cir.1993); *See Galvan v. City of San Antonio,* 435 Fed.Appx. 309, 311 (5th Cir.2010) (explaining that the use of force was reasonable when it involved "measured and ascending responses" to a plaintiff's noncompliance).

39.     Based on the foregoing Fifth Circuit holdings, the Deputies actions here not only did not violate clearly established law, but were in fact in line with the clearly established law and thus lawful. The Deputies here used a measured and ascending response to the noncompliance and resistance they encounter from Salinas.  They used only the force necessary to gain control of Salinas and stop using any force once Salinas was under control.  Specifically, the Deputies attempted to convince Salinas to voluntarily go with EMS for transport for approximately 15 minutes to no avail.[84]  Salinas refused to cooperate with the Deputies and ultimately ceased communication.  At that point in time, the Deputies warned of their intent to execute the Warrant and use force if Salinas did not agree to voluntarily transport with EMS to the mental healthcare facility.  Nevertheless, Salinas remained noncompliant. The Deputies then grabbed Salinas to effect the detention.  See, *Trammell v. Fruge*, 868 F.3d 332, n. 9 (2017) ("[I]t is reasonable for an officer to attempt to grab a noncompliant suspect's arm in an attempt to handcuff the suspect…." The case involved public intoxication.).  Salinas resisted and became physically combative.  He kicked at the Deputies and even punched Deputy Pena.  Since the resistance of Salinas escalated as did his combativeness, two short burst of pepper spray were deployed to gain control of him.  However, it wasn't until Deputy Meakins' bluff that a taser would be deployed did Salinas comply.  The whole struggle lasted less than a minute and a half.

40.     Simply put, finding that a Fourth Amendment violation occurred in this case is not "beyond debate."  *Hanks*, 853 F.3d at 746–47 (quoting *White v. Pauly*, — U.S. —, 137 S.Ct. 548, 551 (2017) (per curiam)).  A reasonable officer could have believed that grabbing Salinas and arresting him after the events that unfolded was reasonable, lawful, and justified under the circumstances.  Accordingly, this Court should render summary judgment for the Deputies on the basis of qualified immunity.

---

[84] It must be remembered that the Warrant provided the officers with the right to arrest Salinas if need be. That right to arrest necessarily carried with it the right to use some degree of physical coercion or threat of it. Graham v. Connor, 490 U.S. 386, 395 (1989) (citing *Terry v.Ohio*, 392, U.S. 696, 703, (1983)).

**Deliberate Indifference to Salinas' Serious Medical Needs Claim**

41.     The Deputies also move for summary judgment as to Plaintiff's deliberate indifference claim on the grounds they are entitled to qualified immunity as their actions did not amount to deliberate indifference nor did they violate clearly established law.

### A. The Deputies were not deliberately indifferent to Salinas' medical needs

42.     The Fourteenth Amendment protects pretrial detainees' right to medical care and to "protection from known suicidal tendencies." *Garza v. City of Donna,* 922 F.3d 626, 632 (5th Cir. 2019); *Hare v. City of Corinth,* 74 F.3d 633, 639 (5th Cir. 1996) (en banc).   A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs.   To prove deliberate indifference, Plaintiffs must show that the Deputies were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that the Deputies actually "dr[e]w the inference," and that the Deputies "disregard[ed] that risk by failing to take reasonable measures to abate it." *Baldwin v. Dorsey*, 19-20465, 2020 WL 3567059, at *3 (5th Cir. July 1, 2020); *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)); *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).   Finally, the Plaintiffs must show that "substantial harm" resulted from the Deputies' alleged deliberately indifferent conduct.   *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

43.     "Deliberate indifference is an extremely high standard to meet." *Id.* at 756.   An incorrect prescription or even a "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.   *Id*.   Rather the plaintiff must establish "that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious

medical needs." *Domino*, 239 F.3d at 756. Stated differently, in order to prevail on a claim of constitutionally inadequate medical care, an arrestee must show that officers displayed deliberate indifference to a serious risk of bodily harm, a standard greater than "[m]ere negligence, or even gross negligence." *Gilbert v. French*, 665 F.Supp.2d 743, 760 (S.D. Tex. 2009).

44.    Here, the competent summary judgment evidence conclusively establishes that the Deputies did not act with "deliberate indifference" towards a perceived serious medical condition of Salinas. The summary judgment evidence conclusively establishes that the Deputies immediately called EMS to come decontaminate Plaintiff after he was pepper sprayed. EMS arrived in approximately fifteen (15) minutes. Chris Wheeler, a certified paramedic, decontaminated Salinas outside of the EMS unit before escorting him into the EMS unit where he was further evaluated. During that evaluation, the EMS crew performed a medical assessment which included checking his vitals, a neurological examine, and a physical assessment and made a general impression and primary and secondary assessment. Based on the assessment, EMS felt as though Salinas did not suffer from any serious medical condition and medically cleared him and returned him to the back of Deputy Pena's police vehicle to wait until another EMS unit arrived to transport him to Palms. He never informed EMS or the deputies that he was experiencing any medical issues other than those usually associated with being sprayed with pepper spray. From the time he was released back to the deputies' custody until the time he was found unresponsive in the back of the patrol vehicle, only approximately twenty (20) minutes lapsed. Deputy Pena and Lt. Franco were the only deputies present. During that time, he was in the back of the patrol vehicle with the deputies standing just feet away.

45.    In *Marshall*, this District Court held that an officer's obligation to provide medical care is ordinarily satisfied by calling an ambulance or permitting EMS access to the injured individual. *McIntosh v. Smith*, 690 F. Supp. 2d 515, 529-30 (S.D. Tex. 2010) (finding no deliberate indifference to medical needs of suspect shot by officer, where officer immediately radioed that shots were fired

and ambulance arrived shortly thereafter). Likewise, the Fifth Circuit in *Fortune* and *Mace* held the same thing. *Fortune v. McGee*, 606 Fed. Appx. 741, 743–44 (5th Cir. 2015) (finding no deliberate indifference where the deputy sheriff called for an ambulance as soon as he realized Fortune was in distress, and helped Fortune to the first floor so he could be transported to the hospital because it did not "evince a wanton disregard" for Fortune's serious medical needs as the deputy sheriff did not refuse to treat Fortune, ignored his complaints, or intentionally treated him incorrectly.); *Mace v. City of Palestine*, 333 F.3d 621, 626 (5th Cir. 2003) (the summoning of an ambulance to a scene of a shooting even though a significant period of time passed before the suspect was transported to an emergency room was not found to be deliberate indifference).

46.     The Fifth Circuit has held that in order to amount to deliberate indifference, the need for medical attention must be so apparent that even laymen would recognize the medical attention is needed. *Gobert v. Caldwell,* 463 F.3d 339, 345 n. 12 (5th Cir. 2006). In the case at bar, if trained medical personnel, such as Chris Wheeler, an EMS certified paramedic, did not see the need for more extensive medical attention, Salinas' situation simply cannot rise to the level of a serious medical need for which "treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id.*

47.     Furthermore, the Fifth Circuit, in *Batiste v. Theriot*, 458 Fed. App'x 351 (5th Cir. 2012), addressed a case with somewhat similar facts. In *Batiste*, the plaintiff died a short time after being shot with a taser in a foot pursuit with police; his family sued the involved officers, alleging excessive force and the denial of medical care. The Fifth Circuit held that the on-scene officers were entitled to qualified immunity and had not acted with deliberate indifference to the plaintiff's clear medical needs because the officers at the scene never thought that "there was a serious medical emergency" and an ambulance was summoned shortly after the officer subdued Batiste. *Batiste*, 458 Fed. App'x at *4-*5.

48.     In *Wagner v. Bay City*, the Fifth Circuit dismissed a plaintiff's deliberate indifference claim, which was based on an officer's conclusion an arrestee should be transported to jail, rather than the hospital.  *Wagner*, 227 F.3d at 319.  The officer did not contact paramedics; rather, the handcuffed arrestee was placed in the back of the squad car in a prone position and driven to jail.  *Id.*  During transport, the arrestee stopped struggling, but the officer heard "a couple of groans."  *Id.*  When the squad arrived at the jail, the arrestee was unresponsive.  *Id.*  The Court found the plaintiff's deliberate indifference claim failed because the officer, who heard the arrestee groaning during transport, had no reason to believe the arrestee's breathing was compromised and, upon discovery the arrestee was not breathing, immediately began CPR.  *Id.* at 325.  Thus, the plaintiff could not establish the subjective element of a deliberate indifference claim.  *Id.*  Like the case at bar, Deputy Pena visually checked on Salinas about one (1) minute before the EMS crew arrived to transport him and saw that Salinas was licking his lips.[85]  As such, the evidence conclusively establishes that Deputy Pena and Lt. Franco were not deliberately indifferent to Salinas' wellbeing.

49.     In addition, in *Olabisiomotosho v. City of Houston*, the Fifth Circuit considered a case where the plaintiff's case turned on the alleged failure of specific defendants to "take better care of [the plaintiff,]" and the alleged failure to medically screen her and secure treatment.  *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 526 (5th Cir. 1999).  The plaintiff suffered from severe chronic asthma and needed a prescription inhaler.  *Id.* at 524.  She had allegedly requested to take her inhaler before she was transported to jail, and one of the officers allowed her to retrieve it from her car and use it.  *Id.*  However, she was coughing, wheezing, and short of breath by the time she got to the jail, and she told officers she needed to see a doctor.  *Id.*  She was eventually taken to a cell, where she stayed until the next morning.  *Id.*  She contended that she asked two officials if she could see a doctor and was told the clinic was closed.  *Id.*  She also contended that she was not medically screened during the

---

booking process. *Id.* When the plaintiff appeared at her initial hearing the next day, she told the judge that she was having an asthma attack and the jail clinic was closed; the judge ordered the guard to take the plaintiff to the jail clinic for treatment. *Id.* Eventually, after the plaintiff fainted, jail personnel treated her for an asthma attack and transported her to a hospital, but she lapsed into a coma and even temporarily lost her eyesight. *Id.* She sued and alleged a deliberate denial of medical treatment. *Id.* at 525. When reviewing these facts, the Fifth Circuit affirmed summary judgment dismissal on the grounds that the defendant officers' conduct did not amount to "deliberate indifference" under § 1983.

50.     Here, EMS was summoned immediately after discharge of pepper spray and Salinas was seen by medical personnel fifteen (15) minutes. He was decontaminated and medically assessed by EMS personnel. He was cleared for transport by EMS and returned to the Deputies' custody while they waited for the arrival of the EMS unit that would transport Salinas to the mental hospital. He was only in the Deputies custody for approximately twenty (20) minutes sitting in an air-conditioned car while the back windows partially rolled down during which time, he suffered sudden cardiac arrest. Given the facts here, no claim of §1983 "deliberate indifference", as a matter of law, can exist. Furthermore, the summary judgment evidence in Ms. Frasier's declaration conclusively establishes that a reasonable office could have concluded that once emergency medical personal released Salinas back into the custody of Deputy Pena and Lt. Franco after having spent approximately fifteen (15) minutes examining and treating him, that it was safe to place him back in the patrol vehicle. Also, a reasonable officer could have concluded that when dealing with a mentally ill subject who has recently been in an agitated state and a physical altercation, like Salinas, that it was acceptable to not engage Salinas, who appeared calm, in back of the patrol vehicle as it may well escalate the situation and cause him to return to the agitate and combative state. [86]

---

[86] Ex. 15.

**B. The Deputies did not violate clearly established law in the handling of Salinas'
medical care**

51.     Based on this District and the Fifth Circuit's rulings in *Wagner*, *Basiste*, *Fortune*, *Mace*,
*Olabisiomotosho* and *Marshall* as explained above, a reasonable officer could have believed that none
of the Deputies violated Salinas' rights in failing to provide adequate medical care where the Deputies
called for EMS right after Deputy Pena administered pepper spray, placed Salinas in a running police
vehicle with the air conditioner on and the back windows rolled down for fifteen (15) minutes then
being removed from the police vehicle to be decontaminated and medically assessed by a licensed
paramedic which took approximately sixteen (16) minutes, then being returned back to the same
police vehicle for approximately twenty (20) while waiting for another EMS unit to arrive.  In
addition, Deputy Pena physically got into his police vehicle during that twenty (20) minute time
period and moved the vehicle.  He also kept a period visual inspection on Salinas while standing
outside the vehicle.  At no time did Deputy Pena or the other deputies ever believe Salinas suffered
from a serious medical condition that needed immediate medical attention.  The summary judgment
evidence presented through the video documenting the events along with the proffered testimony,
makes clear that a reasonable officer, given the totality of the circumstances, could believe that the
Deputies conduct was lawful. Further, no case law exists establishing a violation of Salinas'
constitutional rights beyond debate at the time of the incident made the basis of this suit.  In fact, the
existing case law favors the Deputies.

## VI.    Conclusion

WHEREFORE, PREMISES CONSIDERED, Deputies Adrian Pena, Robert Meakins, George
Poynter, Derek Franco and Rick Villarreal, pray that the Court GRANT Defendants' Motion for
Summary Judgment and dismiss all causes of action asserted by Plaintiffs against them and for such
other and further relief to which they may be justly entitled.

Respectfully submitted,

CULLEN, CARSNER, SEERDEN & CULLEN, L.L.P.
119 South Main Street (77901)
Post Office Box 2938
Victoria, Texas 77902
Tel: (361) 573-6318; Fax: (361) 573-2603

By:＿＿＿/s/ Casey T. Cullen＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　Kevin D. Cullen
　　　Southern District of Texas Bar No. 957
　　　Casey T. Cullen
　　　Southern District of Texas Bar No. 1130427
　　　ATTORNEYS FOR DEPUTIES ADRIAN PENA, ROBERT
　　　MEAKINS, GEORGE POYNTER, DEREK FRANCO AND
　　　RICK VILLARREAL

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing pleading has been served on all counsel of record on this the 24th day of July, 2020 via ECF electronic notice in compliance with Rule 5 of the Federal Rules of Civil Procedure and paragraph 9 of the Southern District of Texas's Administrative Procedures for Electronic Filing in Civil and Criminal Cases by notice of Electronic Filing in accordance with the Federal Rules of Civil Procedure.

/s/ Casey T. Cullen＿＿＿＿＿＿＿＿＿
Casey T. Cullen