United States District Court
Southern District of Texas
**ENTERED**
October 14, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JESUS SALINAS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:18-CV-377 |
| | § | |
| BEE COUNTY SHERIFF'S OFFICE, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

This case arises from the death of Jamie Salinas ("Jaime") while in the custody of deputies of the Bee County Sheriff's Office. His parents, Jesus and Beatrice Salinas, individually and as representatives of his estate, filed separate lawsuits which have been consolidated seeking damages under 42 U.S.C. § 1983, alleging that several deputies violated Jaime's Fourth and Fourteenth Amendment rights. (D.E. 19). At issue are Plaintiffs' remaining claims of excessive force and deliberate indifference against the deputies involved in their individual capacities. (D.E. 29, D.E. 33 and D.E. 41). Defendants have filed a Motion for Summary Judgment asserting they are entitled to qualified immunity to which Plaintiffs responded and Defendants replied. (D.E. 61, D.E. 68, D.E. 69 and D.E. 73).[1] For the reasons stated below, it is respectfully recommended that the Court **GRANT** Defendants' Motion for Summary Judgment.[2] (D.E. 61).

---

[1]The parties agree that all claims against Deputy Rick Villareal should be dismissed as well as Plaintiff Jesus Salinas' state law claims. (D.E. 61, Page 1, FN 1 and 2 and D.E. 68, Page 1, FN 1).

## I.    JURISDICTION

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned United States Magistrate Judge for case management pursuant to 28 U.S.C. § 636.  (D.E. 44).

## II.   BACKGROUND

As early as 2012, Jaime suffered from several mental health ailments, including schizophrenia, which required intermittent hospitalizations.  (D.E. 68-2, Page 5 and D.E. 68-13, Page 2).  On May 10, 2017, Jaime was taken to the Coastal Plains Mental Health Center ("Coastal Plains") by his mother, Plaintiff Beatrice Salinas, for an appointment as he had reportedly not been sleeping or eating, appeared to be confused and was hallucinating, similar to when he was hospitalized two weeks prior.  (D.E. 68-2, Pages 4-5).  It was agreed by Jaime's mother, doctor, nurse and counselor that Jaime should again be hospitalized for treatment.  (D.E. 68-2, Page 5).  Jaime's counselor then left to obtain an emergency warrant to have Jaime hospitalized as he was exhibiting "signs of psychosis" and deteriorating mental health.  (D.E. 61-1 and D.E. 68-2, Pages 5-6).  After waiting approximately two to three hours at Coastal Plains for the warrant to be obtained, Jaime advised his mother that he wanted to go home, eventually laying down in the back

---

[2]In their response, Plaintiffs have included the expert report of Dr. Michael Lyman where he opines as to the reasonableness of Defendants' actions.  Defendants have filed a Motion to Exclude certain portions, if not all, of this report and to limit Dr. Lyman's testimony accordingly. (D.E. 74, D.E. 75 and D.E. 76).  Having reviewed the proffered opinion, it does not change the outcome of the undersigned's recommendation as to the Motion for Summary Judgment and therefore, the undersigned recommends the Motion to Exclude be **DENIED as moot** if this M & R is adopted.  (D.E. 74).

of his mother's truck parked in front of the building after she advised him it would be best to wait at Coastal Plains.  (D.E. 68-2, Page 6).

At approximately 4:45 p.m., Jaime's counselor returned with the emergency warrant and advised Plaintiff Beatrice Salinas she had the warrant and that Jaime was going to be transported.  (D.E. 61-1 and D.E. 68-2, Page 6).  At the same time, EMS personnel arrived to transport Jaime after service of the emergency warrant by Defendant Deputy George Poynter.  (D.E. 61-1, Page 1; D.E. 61-9, Page 3; D.E. 61-12, Page 1 and D.E. 68-3, Page 1).  Deputy Poynter served the warrant and then left the scene.  (D.E. 61-9, Page 3 and D.E. 68-3, Page 1).  As EMS attempted to transport Jaime, who was now sitting on the ground, he became agitated, refused to be transported and returned to the bed of the truck.  (D.E. 61-12 and D.E. 68-3, Page 1).  After Jaime continued to refuse to be transported, EMS then requested police assistance and Defendants Lt. Derek Franco, Deputy Adrian Pena, and Deputy Poynter responded.  (D.E. 61-7, Page 2; D.E. 61-9, Page 4; D.E. 61-12 and D.E. 68-6, Page 16).    The deputies attempted to verbally persuade Jaime to be transported to the behavioral health center for approximately 15 minutes.  (D.E. 63, Video Recording ("VR") Exhibit 2, 17:29:02 to 17:43:26).  While Jaime cursed at the deputies multiple times and continuously refused to obey commands during this time, he did not otherwise exhibit aggressive behavior while alternating between laying both on his front and his back and sitting both in the bed of the truck and on a cooler tied to the bed of the truck.  (D.E. 63, VR Exhibit 2, 17:29:02 to 17:43:26).  Also during this time, EMS left and Deputy Robert Meakins arrived at the scene.  (D.E 61-12, Page 2 and D.E. 68-6, Page 25).

3 / 22

Shortly after their first interaction with Jaime, deputies warned him that if he did not voluntarily get out of the truck, they were going to have to take him forcefully and he was making it more difficult for himself. (D.E. 63, VR Exhibit 2, 17:31:19). Eight minutes later, having not touched Jaime in the back of the truck, deputies again warned him that they would have to take him into custody in handcuffs "kicking and screaming" if he did not comply. (D.E. 63, VR Exhibit 2, 17:39:53). Jaime, while laying on his stomach, then held onto the rope which secured the cooler to the truck. (D.E. 63, VR Exhibit 2, 17:40:23). Just over three minutes later and approximately 15 minutes from their first interaction, the deputies began physically removing Jaime from the truck by grabbing his arms and legs. (D.E. 63, VR Exhibit 2, 17:43:27). Jaime actively resisted, struggling against the deputies for approximately 20 seconds before Deputy Meakins called for pepper spray. (D.E. 61-7, Page 8; D.E. 61-8, Page 3 and D.E. 63, VR Exhibit 2, 17:43:47). Approximately 20 seconds after that, Jaime, who was still struggling against the deputies and had punched Deputy Pena in the face, was pepper sprayed in the face twice by Deputy Pena. (D.E. 63, VR Exhibit 2, 17:44:05; D.E. 61-7, Pages 8-10 and D.E. 68-6, Pages 26-28). Jaime continued to resist for approximately 20 more seconds until Deputy Meakins threatened to use a taser if Jaime did not comply. (D.E. 61-7, Page 9; D.E. 61-8, Page 3 and D.E. 63, VR Exhibit 2, 17:44:26). Jaime immediately complied, was placed in handcuffs and immediately put in the back of a Deputy Pena's police vehicle. (D.E. 63, VR Exhibit 2, 17:44:26-17:45:30). The air conditioner in the vehicle was on but was not working very well. (D.E. 63, VR Exhibit 5, 18:40:30 and D.E. 68-6, Page 28). However, shortly after Jaime was placed in the vehicle, Deputy Pena rolled

down the two back windows after Jaime requested fresh air.  (D.E. 68-6, Pages 30-31).

Jaime was visibly breathing heavy and sweating until he was removed from the vehicle

approximately 15 minutes later to be treated by EMS.  (D.E. 63, VR Exhibit 4 and D.E.

61-13).

      EMS treated Jaime for approximately 16 minutes.  (D.E. 61-13).  EMS first

flushed his eyes with sterile water and then checked his vital signs, including his blood

pressure, pulse and respiratory rate.    (D.E. 61-13).  Jaime's treating EMS paramedic

averred Jaime complained about his eyes burning but did not complain of any injuries,

chest pain or difficulty breathing and he further averred he did not observe Jaime having

difficulty breathing or acting as though he was having chest pain.  (D.E. 61-13).  EMS

medically cleared Jaime and returned him to the deputies' custody, where he walked back

to and was again placed in the back of Deputy Pena's police vehicle.  (D.E. 61-13 and

D.E. 61, Exhibit 5 and D.E. 7, Page 145).  While Jaime was being treated by EMS,

Deputy Meakins left the scene as did Deputy Poynter shortly after Jaime was placed back

in the vehicle, which had the windows still down and the air conditioning running.  (D.E.

61-8, Page 4; D.E. 61-9, Page 5 and D.E. 68-6, Page 35).  Jaime immediately laid down

and Deputy Pena and Lt. Franco periodically looked into the vehicle to check on him but

did not interact with Jaime, who they thought was sleeping.  (D.E. 68-6, Page 35-37).

      Approximately 20 minutes after Jaime was placed back in the police vehicle and

just under an hour after he was pepper sprayed, the EMS transport crew arrived and

Deputy Pena and Lt. Franco attempted to wake up Jaime and found him to be

unresponsive.  (D.E. 63, VR Exhibit 5, 18:39:44 and D.E. 68-6, Pages 36-37).[3]  EMS attempted to resuscitate Jaime but he did not respond, was taken to an emergency room and was later pronounced dead.  (D.E. 61-13, Page 2; D.E. 61-14 and D.E. 68-13).  The Nueces County Medical Examiner determined Jaime's cause of death was "[s]udden cardiac arrest (ventricular dysrhythmia following restrain procedure)."  (D.E. 68-13, Page 2).

## III.   SUMMARY JUDGMENT

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*. at 251–52.  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp*., 278 F.3d 448, 451 (5th Cir. 2002).  However, when there

---

[3]There is no video footage of Jaime for approximately 40 minutes, from the time he was removed from the vehicle to be treated by EMS until he was found unresponsive.  Deputy Pena testified his body camera was off because the battery was low and he turned it on only when he was going to interact with Jaime and the camera in his unit was not functioning.  (D.E. 61-7, Page 15 and D.E. 68-6, Page 33).  Using the times on Deputy Pena's body camera and the EMS testimony that Jaime was treated for 16 minutes, Jaime was in the vehicle the second time for approximately 20 minutes.  (D.E. 61-13; D.E. 63, VR Exhibit 4, 18:01 and VR Exhibit 5, 18:39:44).

is a videotape that discredits the non-movant's description of the facts, courts will "consider 'the facts in the light depicted by the videotape.'" *Shepherd v. Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id*. Furthermore, affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56; *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for

trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56; *Anderson*, 477 U.S. at 248.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998).  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451.

## IV.   ANALYSIS

### A.   QUALIFIED IMMUNITY

Defendants move for summary judgment as to Plaintiffs' excessive force and deliberate indifference claims on the grounds they are entitled to qualified immunity. Government officials performing discretionary duties can respond to § 1983 claims by asserting qualified immunity.  *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (citing *Haverda v. Hays Cty*., 723 F.3d 586, 598 (5th Cir. 2013).  If more than one government official asserts qualified immunity, a court must consider each official's actions separately.  *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007).

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S.

Ct. 305, 308 (2015)).   Government officials are given "breathing room to make reasonable but mistaken judgments" and "all but the plainly incompetent or those who knowingly violate the law" are protected.  *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citations omitted).  Qualified immunity "represents the norm, and courts should deny a defendant immunity only in rare circumstances."  *Rich*, 920 F.3d at 294; *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (Courts "must think twice before denying qualified immunity.")

The usual summary judgment burden of proof is altered in the case of qualified immunity defense.  *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).  When a government official has pled the defense of qualified immunity alleging the actions taken were in good faith and within the scope of discretionary authority, the burden is on the plaintiff to establish the official's conduct violated clearly established law.  *Id*.  Plaintiff cannot rest on pleadings; instead, Plaintiff must show a genuine issue of material fact concerning the reasonableness of the official's conduct.  *Id*.; *Bazan v. Hidalgo Cty*., 246 F.3d 481, 489-90 (5th Cir. 2001).   To survive summary judgment on the issue of qualified immunity, plaintiffs must satisfy two independent inquiries.  First, whether viewing the summary judgment evidence in the light most favorable to plaintiffs, the defendants violated the alleged victim's constitutional rights.  *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007); *Delaughter v. Woodall*, 909 F.3d 130, 137-38 (5th Cir. 2018). If the Court determines "that the alleged conduct did not violate a constitutional right, [the] inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 410

(5th Cir. 2009) (citation omitted).  If there is a genuine dispute of material fact regarding whether there was a constitutional rights violation, the Court then asks whether defendants' actions were objectively unreasonable in light of the clearly established law at the time of the constitutional violation.  *Freeman*, 483 F.3d at 411; *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (The second prong requires courts to "ask whether the right was clearly established—that is, whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (citation omitted).  "Clearly established law is determined by 'controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.'"  *Delaughter*, 909 F.3d at 137 (citation omitted).  "Though a 'case directly on point' is not required, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Rich*, 920 F.3d at 294 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  The second step requires courts to determine whether the unlawfulness of the officers conduct was clearly established at the time of the incident.  *Dyer v. Houston*, 964 F.3d 374, 383 (5th Cir. 2020) (citations omitted); *Mullenix*, 136 S. Ct. at 308 ("A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right'") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Delaughter*, 909 F.3d at 140.

If the Court answers both questions in the affirmative, the government official is not entitled to qualified immunity.  *Lytle*, 560 F.3d at 410.  Courts are permitted to exercise discretion in determining the order in which to analyze the two-part qualified

immunity test.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (permitting courts to address the prongs of the qualified immunity inquiry in whichever order they choose); *Dyer*, 964 F.3d at 380.  "If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability…and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment."  *Haverda*, 723 F.3d at 599 (citation omitted).  At this stage, a court's qualified immunity inquiry requires a court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true."  *Haggerty*, 391 F.3d at 655; *Tolan v. Cotton*, 572 U.S. 650, 651, 657-59 (2014).  "If, upon viewing the evidence in the light most favorable to the [plaintiff], reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity."  *Id*. ("This inquiry is an objective one, not dependent on the particular officer's subjective beliefs.") (citation omitted).

## B.    EXCESSIVE FORCE

Plaintiffs argue Defendants are not entitled to qualified immunity because the force used by the deputies was excessive to the need and Jaime's right to be free from such force was clearly established at the time in question.  The undersigned disagrees and, for the reasons stated below, recommends the Defendants are entitled to qualified immunity.

The Fourth Amendment right against unreasonable seizures is examined when a plaintiff alleges excessive force during an investigation or arrest.  *Tolan*, 572 U.S. at 656

(citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citation omitted). "But even an officer who may lawfully use or threaten force must appropriately calibrate the amount of force he employs to the need for force he confronts." *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (citation omitted).

For an excessive force claim, a plaintiff satisfies the first prong of the qualified immunity analysis at the summary judgment stage as to whether there was a constitutional violation by demonstrating there is a genuine issue of material fact as to whether plaintiff sustained: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Shepherd*, 920 F.3d at 283 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. There must be an "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving" and "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. *Id*. (citations omitted). "An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 846 (5th Cir. 2009) (citations omitted).

Courts must look at the "totality of the circumstances" when assessing the reasonableness of a police officer's use of force, requiring "careful attention to the facts and circumstances of each particular case, including the severity the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation omitted).

Here, there is no dispute Jaime suffered an injury. Therefore, the only question is whether the summary judgment evidence establishes that the use of force was clearly excessive or, alternatively, was objectively reasonable. Viewing the facts in the light most favorable to Plaintiff, the undersigned recommends the deputies' actions during Jaime's arrest did not violate his Fourth Amendment right to be free from excessive force during a seizure. Reviewing the *Graham* factors, they support the deputies' decision to resort to Jaime's physical removal from the truck. While Jaime was not suspected of having committed a crime, a reasonable officer could have perceived him as an immediate threat as there was an emergency warrant for confinement to a mental health facility obtained as a result of Jaime's counselor averring there was a substantial risk that Jaime would seriously harm himself or others. Accordingly, a reasonable officer could have believed Jaime posed a potential danger to the deputies and others, as well as himself. Further, Jaime repeatedly refused to comply with the warrant by refusing being transported to the mental health hospital by EMS, resulting in the need for police to be called. After the deputies arrived, Jaime continuously refused to comply with the deputies' commands for approximately 15 minutes, cursing at them several times and

ultimately refusing responsive communication. Further, after being warned that they would have to use physical force, Jaime grabbed the rope tied to the back of the truck indicating active resistance.

However, because Jaime's resistance was relatively passive, the deputies were entitled to use only a proportional amount of force, which they undersigned recommends they did. They did not draw their firearms during the encounter, using their hands to pull Jaime from his vehicle. There is no evidence Jaime was ever struck by any of the defendants, even as he kicked and punched at them for over a minute. In short, the only force employed was to remove Jaime from the truck after deputies spent over 15 minutes attempting to negotiate with him and making no progress. *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016) (Courts should examine the quickness which officers escalate from negotiation to force). The officers waited approximately 15 minutes before physically  removing Jaime from the bed of the truck; this was not objectively unreasonable, especially given Jaime's consistent refusal to comply with the deputies' commands, the possibility he could hurt himself or others, and his refusal to communicate with the Defendants. *Id.* (Two minutes of negotiation before using force was not objectively unreasonable). While Plaintiffs assert the deputies should have taken longer to negotiate with Jaime, they fail to cite to any case law to support their assertion that 15 minutes was insufficient, especially given Jaime's unwillingness to communicate. Further, pepper spray was used only after Jaime physically resisted by kicking at and struggling against all of the deputies and after he had punched Deputy Pena in the face at least once, knocking his glasses off. Even after being pepper sprayed, Jaime continued to

14 / 22

actively resist for over 20 seconds and only cooperated after being threatened with the use of a taser.  Further, the treating paramedic averred Jaime did not complain of any injuries other than his eyes burning.  For these reasons, the undersigned recommends the use of force by the Defendants was not clearly excessive and was objectively reasonable.

Even if the Defendants' actions had violated the Fourth Amendment, contrary to the undersigned's recommendation above, the undersigned recommends summary judgment would still be appropriate because the deputies would be entitled to qualified immunity as the violation was not clearly established law.  At the second step of the immunity inquiry at summary judgment in an excessive force case, a plaintiff must show the officer's use of force was objectively unreasonable in light of clearly established law at the time the challenged conduct occurred.  *Manis*, 585 F.3d at 845.  "If the law at the time of a constitutional violation does not give the officer 'fair notice' that his conduct is unlawful, the officer is immune from suit."  *Id*. at 846 (citation omitted).  "[A]n officer who has a mistaken, yet reasonable, understanding of the law from the 'hazy border between excessive and acceptable force'" is protected.  *Id*. (citation omitted).  "A right is clearly established if, in light of preexisting law, the unlawfulness of the action would be apparent to a reasonable officer."  *Id*. (citation omitted).  In short, "overcoming qualified immunity is especially difficult in excessive-force cases."  *Morrow*, 917 F.3d at 876.  "This is an area of law in which the result depends very much of the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.  *Id*. (citations omitted).  The inquiry here is

whether, under the law in effect at the time deputies physically grabbed and pepper sprayed Jaime, a reasonable officer could have believed the use of force was lawful.

Plaintiffs appear to argue that no force can ever be used on an individual who is passively resisting being detained, citing to several cases where officers quickly escalated their use of force.  (D.E. 68, Pages 21-25).  These cases are clearly distinguishable from the case at hand where the deputies warned Jaime at least twice over the course of 15 minutes of negotiation that if he did not cooperate, they were physically going to remove him from the truck and place him in handcuffs.  Further, the deputies in this case used a proportional amount of force to remove Jaime from the vehicle after he stopped communicating with them, i.e. their hands while Jaime initially struggled against them as they attempted to extract him from the bed of the truck and pepper spray only after Jaime punched Deputy Pena in his face at least once and kicked at the deputies, actively resisting arrest for over 30 seconds.  *Brothers*, 837 F.3d at 519 (Officials were entitled to qualified immunity where they used a proportional amount of force, their hands, to pull Plaintiff from his vehicle after plaintiff passively resisted).  "The only force they employed was pursuant to and required for removing him from the truck."  *Id*. (Noting the officers did not pull with excessive force but "slowly escalated the amount of force until it was enough to extract [plaintiff].")

None of the cases cited by Plaintiffs provide analogous facts and certainly do not put the "constitutional question beyond debate." *Rich*, 920 F.3d at 294.  At best, the cases cited by Plaintiff stand for the proposition that clearly established law demonstrates an officer violates the Fourth Amendment if the officer attempts little to no negotiation and

"abruptly resorts to overwhelming physical force" with an individual who offers passive resistance. *Hanks*, 853 F.3d at 738, 747 (Employing a "half spear" takedown after plaintiff had complied with several of the officer's instructions, was offering at most passive resistance and was facing away from the officer with his empty hands displayed behind his back when he was hit); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) (Smashing out driver's side window and then dragging plaintiff out of and slamming her against her vehicle after engaging in little to no negotiation after she refused to exit the vehicle after a traffic stop); *Doss v. Helpenstell*, 626 F. App'x 453, 460 (5th Cir. 2015) (Officer struck plaintiff, who was seated in his car and displaying passive resistance, in the head several times with a pistol); *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) (Three officers executed a knee strike on Plaintiff, put him in a headlock and pulled him to the ground after plaintiff refused to comply with an officer's initial request three seconds prior); *Newman v. Guedry*, 703 F.3d 757, 759-63 (5th Cir. 2012) (Officers pushed a plaintiff down onto the trunk of a car, then beat him with a baton 13 times and tased him three times, including once after he was on the ground, without first attempting any negotiations or commands).

In short, Plaintiffs point to no authority establishing that it was unreasonable for deputies to use their hands to secure Jaime, who was the subject of an emergency mental health warrant, after 15 minutes of unproductive negotiation and to then pepper spray him twice after he activity resisted arrest for over 30 seconds and had punched a deputy in the face at least once. The undersigned recommends there is no settled authority to put a reasonable officer on notice that the use of force in this situation violated Jaime's

constitutional rights. *Rich*, 920 F.3d at 294. Accordingly, the undersigned recommends Defendants are entitled to qualified immunity as to Plaintiffs' claim of excessive force.

## C.   DELIBERATE INDIFFERENCE

Plaintiffs argue Defendants are not entitled to qualified immunity as to the claim of deliberate indifference. Again, the undersigned disagrees and, for the reasons stated below, recommends the Defendants are entitled to qualified immunity.

A pretrial detainee's constitutional right to medical care and protection from harm during the length of confinement, whether in prison or other custody, stems from the procedural and substantive due process guarantees of the Fourteenth Amendment. *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001); *Wagner v. Bay City*, 227 F.3d 316 (5th Cir. 2000). "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer*, 964 F.3d at 380 (citation omitted). "Deliberate indifference is an extremely high standard to meet" and "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Id.* at 380-81. The plaintiff must "establish that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Rogers v. Boatright*, 709 F.3d 403, 410 (5th Cir. 2013) (citation omitted); *Blank v. Tabera*, 494 F. App'x 473, 474 (5th Cir. 2012) (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).

Here, Defendants called EMS immediately after Jaime had been pepper sprayed and EMS arrived within approximately 15 minutes to examine and treat Jaime. *McIntosh v. Smith*, 690 F.Supp.2d 515, 529-30 (S.D. Tex. 2010) (Officer was entitled to summary judgment on his qualified immunity defense as to deliberate indifference because he immediately called for medical aid after shooting the arrestee who later died from his injuries). There is no competent summary judgment evidence that Defendants deliberately delayed in calling for medical aid. *Id.* Jaime was treated by a certified paramedic, including treatment for the pepper spray and a medical assessment. During this assessment, Jaime complained only of his eyes burning from the pepper spray and Jaime was not observed having difficulty breathing or acting as though he was having chest pain. Further, Jaime was medically cleared before being returned to Defendants' custody to await EMS transport crew. Having been medically cleared, there is no summary judgment evidence that Jaime, who walked back to the vehicle without assistance, needed additional medical attention to even a trained medical professional. *Gobert v. Caldwell*, 463 F.3d 339, 345 n. 12 (5th Cir. 2006) ("A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.") (citation omitted). He was placed in the back of Deputy Pena's patrol car, which had the windows partially down and the not fully functional air conditioning on, where he immediately laid down on his back. Approximately 20 minutes after receiving medical treatment, being medically cleared and returned to Deputy Pena's vehicle, Jaime was discovered to be unresponsive from a sudden cardiac arrest.

There is no indication Defendants recognized Jaime was at risk of serious harm. *Batiste v. Theriot*, 458 F. App'x 351, 357 (5th Cir. 2012) (Officers who called for an ambulance after tasing plaintiff in the foot and did not know there was a serious medical emergency were entitled to qualified immunity because they did not act with deliberate indifference). While Defendant Pena and Lt. Franco may have been negligent or even grossly negligent by failing to physically, rather than just visually, confirm Jaime's status continuously over the course of 20 minutes while waiting for the EMS transport crew, deliberate indifference cannot be inferred from this if they had no indication of a risk of serious harm. *Dyer*, 964 F.3d at 380-81. Defendants did not refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Rogers*, 709 F.3d at 410. Further, Deputy Pena testified he and Lt. Franco were standing right next to the vehicle and could look down and see Jaime, which they both did while waiting for the EMS transport crew. (D.E. 61-7, Page 14). Deputy Pena also testified the last time he visually checked on Jaime was approximately one minute before the EMS transport crew arrived and he saw Jaime licking and moving his lips. (D.E. 61-7, Page 14).

Viewing the summary judgment evidence in the light most favorable to Plaintiffs, the undersigned recommends Defendants did not violate Jaime's Fourteenth Amendment rights as they were not deliberately indifferent to his serious medical needs. Further, even if there was a genuine dispute of material fact regarding whether there was a constitutional rights violation, the undersigned recommends Defendants' actions were objectively reasonable as a reasonable officer would have believed his conduct was

20 / 22

lawful in the situation he confronted.  Therefore, the undersigned recommends the Court find Defendants are entitled to qualified immunity as to Plaintiffs' deliberate indifference claims.

## V.      CONCLUSION

For the reasons stated below, it is respectfully recommended that the Court **GRANT** Defendants' Motion for Summary Judgment.  (D.E. 61).

Respectfully submitted this 14th day of October 2020.

Jason B. Libby
United States Magistrate Judge

## **NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).